# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### JONESBORO DIVISION

DANA LEE LIPFORD                                                                PLAINTIFF


v.                                    NO. 3:15-cv-00374 PSH


CAROLYN W. COLVIN, Acting Commissioner                          DEFENDANT
of the Social Security Administration


<u>MEMORANDUM OPINION AND ORDER</u>


Plaintiff Dana Lee Lipford ("Lipford") commenced the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Lipford maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Lipford first maintains that the ALJ committed error at step three of the sequential evaluation process. Lipford maintains that her impairments meet or equal Listing 12.06, and the ALJ erred when he failed to so find.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See <u>Boettcher v. Astrue</u>, 652 F.3d 860, 863 (8th Cir. 2011).

At step three, the ALJ must determine whether a claimant's impairment, when considered individually and in combination with his other impairments, meets or equals a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is a medical one, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that his impairment meets or equals a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

Listing 12.06 encompasses anxiety-related disorders. The required level of severity for the disorders is met when the requirements of paragraphs A and B are satisfied or when the requirements of paragraphs A and C are satisfied.[2]

---

[2]

Paragraph A of Listing 12.06 requires medical findings of at least one of the following:

1) generalized persistent anxiety accompanied by three out of four of the following signs or symptoms: a) motor tension, b) autonomic hyperactivity, c) apprehensive expectation, or d) vigilance and scanning; or

2) a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4) recurrent obsessions or compulsions which are a source of marked distress; or

5) recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

Paragraph B of Listing 12.06 requires the disorder result in at least two of the following:

1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration.

Paragraph C of Listing 12.06 requires the disorder result in a complete inability to function independently outside the area of one's home.

The medical evidence reflects that in October of 2010, Lipford presented to the University of Arkansas for Medical Sciences ("UAMS") Community Women's Clinic complaining of heavy vaginal bleeding with abdominal pains. See Transcript at 324-328. The progress note from the examination is relevant to her mental disorder because the note contains the following observation: "Denies depression, anxiety, memory loss, suicidal ideation, hallucinations, paranoia, phobia, and confusion." See Transcript at 327. She returned to the UAMS clinic on other occasions, see Transcript at 329-341, and the only mention of her psychiatric condition during the examinations was the following observation: "good eye contact, [circumferential] speech," see Transcript at 340.

On February 10, 2012, Lipford presented to a Mid-South Health Systems clinic for problems associated with her mood and anxiety. See Transcript at 355-356. The progress note from the examination offers little insight into her mental health at that time or how her mental disorder impacted her ability to function. The note simply reflects prior diagnoses of a bipolar disorder, an unspecified anxiety disorder, and psychosocial and environmental problems. The note also reflects that she had been prescribed medication for her mental disorders at some point in the past.

Lipford returned to the Mid-South clinic on at least six other occasions. See Transcript at 343-346 (02/21/2012), 347-348 (02/29/2012), 349-350 (05/10/2012), 351-352, 358 (06/14/2012), 353-354, 357 (08/16/2012), 406-407 (11/15/2012). The progress note from her February 21, 2012, examination contains an interpretive summary in which the following observations were made:

-3-

> ... [Lipford] ... reports that she is "not too happy about things" and that she gets "upset very easily." She primarily reports depressive symptoms and some irritability. She reports a prior diagnosis of Bipolar Disorder and this seems to be primarily based on her report of irritability. However, [she] reports significant benefit from an antidepressant. She reports experiencing a depressed mood, poor sleep, poor appetite, and some decreased energy. She states that these symptoms have been present for years and denies any significant breaks in this mood. Because of her report of depressive symptoms that seem to be less severe than would be expected with a Major Depressive Episode. For this reason combined with the timeframe of her depression, she will be diagnosed with Dysthymic Disorder.

See Transcript at 345-346. The notes from her subsequent visits to the Mid-South clinic reflect that she was repeatedly diagnosed with a dysthymic disorder with secondary diagnoses of an anxiety disorder and a personality disorder with mental retardation. She was prescribed medication. It appears that her mental health largely improved.[3]

On November 6, 2012, Lipford was seen by Dr. Dennis Vowell, Psy.D., ("Vowell") for a mental evaluation and assessment of adaptive functioning. See Transcript at 400-404. Lipford reported, inter alia, increased anxiety and a depressed mood but denied any inpatient treatment for her condition. Vowell diagnosed a major depressive disorder recurrent, most recent episode moderate. With respect to the effects of Lipford's mental disorder on her adaptive functioning, Vowell found the following:

---

[3]

For instance, on February 29, 2012, Lipford reported "doing better, but ... would like to do more better." See Transcript at 348. On June 14, 2012, it was observed that although she occasionally manifested rambling thoughts, "... for the most part she appeared to be doing somewhat better." See Transcript at 351. On August 16, 2012, she reported "some progress with medication," "decreased depression," and adequate sleep and appetite. See Transcript at 353. On November 15, 2012, the following observations were made: "... denies any current perceptual disturbances; ... sleep, appetite, and energy level is adequate, occasional anxiety." See Transcript at 406.

A. How do mental impairments interfere with this person's day to day [a]daptive functioning? …

[Lipford] does not drive, stating, "I don't want to do anything stupid and get my license[] suspended. She is capable of shopping independently. She is capable of managing her own finances. She is able to complete basic household chores and [activities of daily living].

B. Capacity to communicate and interact in a socially adequate manner? …

[Lipford] appeared capable of adequate and socially appropriate communication and interaction in today's session.

C. Capacity to cope with the typical mental/cognitive demands of basic work-like tasks?

[Lipford] appeared to sustain a reasonable degree of cognitive efficiency and was able to track and respond to various kinds of questions and tasks without remarkable slowing or distractibility. However, in situations of mild to moderate stress it is likely she would have difficulty coping efficiently.

D. Ability to attend and sustain concentration on basic tasks?

As noted in the findings of the mental status exam, [Lipford] generally displayed mild to moderate impairments in her ability to respond adequately to basic assessment of attention and concentration capacity.

E. Capacity to sustain persistence in completing tasks?

Persistence appeared adequate throughout the session.

F. Capacity to complete work-like tasks within an acceptable time frame?

[Lipford] did not display remarkable psychomotor slowing. In terms of mental status type tasks, capacity to perform within a basically acceptable time frame was demonstrated.

See Transcript at 403-404. Vowell did not detect any evidence of malingering and

believed the results to be a valid assessment of Lipford's current functioning.

Dr. Christal Janssen, Ph.D., ("Janssen") and Dr. Kay Cogbill, M.D., ("Cogbill") subsequently reviewed Lipford's medical records. <u>See</u> Transcript at 112-114, 128-130. Janssen and Cogbill agreed that Lipford is capable of performing at least simple, repetitive work with incidental interpersonal contact and direct/concrete supervision.

Lipford and her representative completed several forms in connection with Lipford's claim for supplemental security income payments. <u>See</u> Transcript at 222-231, 232-241, 242-243, 264-271. Lipford and her representative represented, <u>inter</u> <u>alia</u>, that Lipford spends time with her family and attends church, but she does not socialize with people outside her family. She nevertheless represented that she has no problem getting along with family, friends, or neighbors.

Lipford testified during the administrative hearing about her mental health. <u>See</u> Transcript at 31-60. She testified that she completed the eleventh grade in school and can read and write. She cannot add or subtract and cannot count money. She did not deny having an unimpressive work history but maintained she could not hold a job because she could not keep up with the pace of a job, could not remember instructions, and had difficulty paying attention to a task. Although Lipford testified that she can get along with others, she has difficulty taking criticism from her supervisors. Certain unavoidable situations, or "triggers," cause her to become upset and frustrated, and the triggers manifested themselves when she attempted to work.

The ALJ found at step two that Lipford's severe impairments include a dysthymic

disorder, depression, and anxiety. The ALJ found at step three that Lipford's impairments do not meet or equal a listed impairment, including Listing 12.06. The ALJ found that Lipford's impairments do not meet or equal paragraph B of Listing 12.06 because she only has mild restrictions in activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and no episodes of decompensation for an extended duration. The ALJ found that Lipford's impairments do not meet or equal paragraph C of Listing 12.06 because "there is no evidence of a complete inability to function independently outside the area of one's home." <u>See</u> Transcript at 13. The ALJ then assessed Lipford's residual functional capacity and found that she is capable of performing light work but with the following non-exertional limitations:

> … [Lipford] retains the mental ability to understand, remember, and carry out simple job instructions that can be learned by demonstration and does not involve using math (no adding, subtracting, multiplying, dividing); make judgments in simple work-related situations such as avoiding obvious work hazards; respond appropriately to co-workers/supervisors, but limited to only occasional, incidental contact that is not necessary to perform the job; no dealing with the general public; no decision making that is integral to performing the job; and respond appropriately to minor changes in usual work routine.

<u>See</u> Transcript at 13-14. In making the foregoing findings, the ALJ gave significant weight to Vowell's opinions but little weight to Janssen and Cogbill's opinions because their opinions were not consistent with the record.

Substantial evidence on the record as a whole supports the ALJ's finding that

Lipford's mental disorder does not meet or equal Listing 12.06. The Court so finds for several reasons.

First, the ALJ could and did find that there is no medical evidence Lipford's impairments meet or equal paragraph B of Listing 12.04. Specifically, the ALJ could and did find that Lipford's impairments do not cause marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Vowell's evaluation reflects that although Lipford has difficulty coping with mild to moderate stress and displays mild to moderate impairment with respect to attention and concentration, the affects of her impairments on her adaptive functioning are not marked.

Second, the ALJ could and did find that there is no medical evidence Lipford's impairments meet or equal paragraph C of Listing 12.06. Specifically, the ALJ could and did find that Lipford's impairments do not result in a complete inability to function independently outside the area of her home. Vowell's evaluation reflects that Lipford is capable of shopping independently, managing her finances, and completing basic household chores and other activities of daily living. Vowell also opined that Lipford appears capable of adequate and socially appropriate communication and interaction. Lipford acknowledged that although she does not spend time with others, she attends church and has no problem getting along with family, friends, or neighbors.

Lipford maintains that she has an intellectual disability. It is true that the record

contains some mention of mental retardation, see Transcript 347, 349,351, 353, but there is no evidence, medical or otherwise, that her alleged intellectual disability has more than a minimal affect on her ability to do basic work-related activities. Assuming the ALJ erred when he failed to consider whether Lipford has an intellectual disability, his error was harmless as he nevertheless limited Lipford to unskilled work.

Lipford offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Lipford maintains that the impact of her carpal tunnel syndrome, neuropathy, and limited I.Q. was not fully developed by the ALJ.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's credibility regarding her subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ makes that evaluation by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

The evidence relevant to Lipford's residual functional capacity reflects that she

has mental disorders, i.e., a dysthymic disorder, depression, and anxiety. The Court has outlined the evidence relevant to the disorders, and the outline need not be reproduced.

The evidence reflects that Lipford is five feet, four inches tall and weighs 230 pounds. See Transcript at 32. The ALJ could and did find that Lipford has a Body Mass Index of approximately 39.6. See Transcript at 16. The question for the ALJ was not whether Lipford is obese but rather the extent to which her weight impacts her ability to perform work-related activities. The evidence on that question is minimal as there is little mention in the record of her weight and the work-related limitations it causes.

The evidence reflects that in May of 2010, Lipford presented to a charitable clinic complaining of painful menstrual cramps. See Transcript at 308, 314. She was diagnosed with severe dysmenorrhea, and medication was prescribed. She was seen at the clinic on subsequent occasions, and hypertension, acute sinusitis, and leg cramps were also diagnosed. See Transcript at 309 (06/03/2010), 310 (06/04/2010), 313 (07/01/2010), 421 (09/20/2012), 420 (12/06/2012), 422 (no date). Medication was again prescribed.

In October of 2010, Lipford presented to the University of Arkansas for Medical Sciences ("UAMS") complaining of heavy vaginal bleeding and abdominal pain. See Transcript at 317-328. The progress note from the examination reflects that irregular menstruation was diagnosed and medication was prescribed. The note otherwise indicates, though, that her medical condition was unremarkable, e.g., normal mobility, full joint motion, no deformities.

Lipford returned to UAMS on two subsequent occasions. See Transcript at 329-335

(11/23/2010), 336-341 (12/14/2010). She continued to complain of symptoms associated with dysmenorrhea, and irregular menstruation continued to be diagnosed. She also complained of a skin condition, and contact dermatitis and recurrent boils were diagnosed. Medication was prescribed. The progress notes reflect that save the aforementioned complaints, her medical condition was unremarkable.[4]

Lipford and her representative completed several forms in connection with Lipford's claim for supplemental security income payments. See Transcript at 222-231, 232-241, 242-243, 264-271. Lipford or her representative represented, inter alia, that Lipford has difficulty understanding and following instructions and her hands and feet hurt. She can attend to her own care, prepare simple meals, perform household chores, shop, and pay her bills.

Lipford testified during the administrative hearing about her mental and physical health. See Transcript at 31-60. With regard to the latter, she testified that she lives alone and can drive an automobile. She continues to have excessive vaginal bleeding and abdominal pain, describing her condition as having a "period in a day." See Transcript at 52. She injured her ankle as a teenager, and the pain prevents her from standing for very long. She is taking no pain medication but is taking Zestril for hypertension.

The ALJ found at step two that Lipford has severe impairments in the form of

---

[4]

Lipford was also seen at the Arkansas Methodist Medical Center on several occasions between September of 2011 and September of 2012. See Transcript at 361-393. She was seen for complaints that do not impact her residual functional capacity. For instance, she was seen in September of 2012 for complaints of eye pain after she was pepper sprayed by a police officer. See Transcript at 361.

"irregular menstruation, hypertension, obesity, dysthymic disorder, depression, and anxiety." <u>See</u> Transcript at 11. The ALJ assessed Lipford's residual functional capacity and found that she is capable of performing a reduced range of light work. With regard to Lipford's physical limitations, the ALJ found that Lipford can "lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours in an eight-hour workday, sit for six hours in an eight-hour workday, push and/or pull 20 pounds occasionally and 10 pounds frequently, and occasionally climb stairs, stoop, crouch, crawl, and kneel." <u>See</u> Transcript at 13.[5] The ALJ made the finding on the basis of the medical evidence, which he found did not fully support Lipford's allegations. The ALJ also made the finding on the basis of the non-medical evidence, which he found did not fully support Lipford's subjective complaints.

Substantial evidence on the record as a whole supports the ALJ's assessment of Lipford's residual functional capacity. The ALJ adequately considered the medical and non-medical evidence and could and did find that Lipford has work-related limitations caused by her mental disorders, obesity, and irregular menstruation. The question for the ALJ was the extent to which the limitations impact Lipford's residual functional capacity. For the following reasons, the ALJ could find as he did.

First, the ALJ adequately incorporated the work-related limitations caused by

---

[5]

The ALJ also incorporated non-exertional limitations into the assessment of Lipford's residual functional capacity. <u>See</u> Transcript at 13-14. Those limitations have previously been identified and need not be reproduced.

Lipford's mental disorders into the assessment of her residual functional capacity. Specifically, the ALJ could and did find that Lipford's mental disorders, though not disabling, are such that she can perform a reduced range of light work but with several non-exertional limitations. The ALJ's findings take into account the effects of Lipford's mental disorders, and the ALJ's findings are supported by substantial evidence on the record as a whole as they are consistent with Vowell's opinions.

Second, the evidence relevant to the work-related limitations caused by Lipford's obesity is minimal. The ALJ nevertheless considered Lipford's weight and its impact on her other impairments in assessing her residual functional capacity. The assessment the ALJ made is consistent with the evidence as there is no indication the combined impact of Lipford's weight and other impairments is greater than that found by the ALJ. Although Lipford's weight causes some limitation, it appears that her work-related limitations are caused primarily by her mental disorders.

Third, the evidence relevant to the work-related limitations caused by Lipford's hypertension and irregular menstruation is also minimal. The ALJ could and did find that the treatment for Lipford's hypertension has been "essentially routine and/or conservative in nature and there is no evidence of end organ damage." See Transcript at 16. Clearly, Lipford has experienced problems as a result of her irregular menstruation and has received extensive treatment for her problems. The treatment, though, has largely been in the form of medication.

Fourth, the non-medical evidence relevant to the effects of Lipford's impairments

is conflicting and capable of more than one acceptable characterization. Lipford represented that her daily activities are severely limited, and the Court accepts that her activities are as she represented. The ALJ could discount, though, Lipford's representations regarding her activities because there is little evidence, medical or otherwise, to support such an extreme limitation of her activities. The ALJ properly noted Lipford's use of medication, and the ALJ could and did find that it was largely conservative and/or routine. The ALJ also considered Lipford's work history and could and did note the following: "[a] review of [Lipford's] work history shows that [she] worked only sporadically prior to the alleged disability onset date, which raises a question as to whether [her] continued unemployment is actually due to medical impairments." See Transcript at 17.

Lipford faults the ALJ for failing to give greater consideration to Lipford's limited IQ, carpal tunnel syndrome, and neuropathy in her feet. Lipford also faults the ALJ for failing to order an independent medical evaluation to assess the severity of the impairments and to determine their impact on Lipford's residual functional capacity. The ALJ gave little consideration to Lipford's IQ, carpal tunnel syndrome, and neuropathy in her feet, and the ALJ's failure to do so does not warrant a remand. There is little medical evidence to support the impairments, and there is no evidence they impact the most Lipford can do despite her limitations. It was therefore unnecessary for the ALJ to order an independent medical evaluation.

"The ALJ is in the best position to gauge the credibility of testimony and is granted

-14-

deference in that regard." See Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). In this instance, Lipford has not offered a valid reason for deviating from that rule. The characterization of her subjective complaints made by the ALJ was adequate and is one of the acceptable characterizations permitted by the evidence. The Court is not persuaded that Lipford's subjective complaints were erroneously evaluated.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Accordingly, Lipford's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 14th day of June, 2016.


_____
UNITED STATES MAGISTRATE JUDGE